# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

SHAO HAO ZHEN,                     )
      Petitioner,            )
                    )
v.                                 )          CIVIL ACTION NO. 1:04-0622
                    )
VANESSA ADAMS, Warden,             )
FPC Alderson,                      )
      Respondent.            )

## PROPOSED FINDINGS AND RECOMMENDATION

On June 18, 2004, Petitioner, an inmate at FPC Alderson, in Alderson, West Virginia, and

acting *pro se,* filed an "Application Under 28 U.S.C. § 2241 for Writ of Habeas Corpus by a Person

in State or Federal Custody."[1] (Document No. 1.) Petitioner challenges the practice implemented by

the Federal Bureau of Prisons [BOP] in December, 2002, limiting the portion of her sentence that

could be served in a Community Corrections Center [CCC]. (Id.) By Standing Order filed on June

21, 2004, this matter was referred to the undersigned United States Magistrate Judge for the

submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C.

§ 636(b)(1)(B). (Document No. 2.) Pursuant to Rule 4 of the Rules Governing Section 2254 Cases

in the United States District Courts which have been extended to petitions filed under § 2241, "[i]f

it plainly appears from the face of the petition . . .that the petitioner is not entitled to relief in the

district court, the judge shall make an order for its summary dismissal and cause the petitioner to be

notified." Having examined Petitioner's Application and exhibits attached thereto, the undersigned

---

[1] Because Petitioner is acting *pro se,* the documents which she has filed are held to a less
stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally.
*See Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

has concluded that Petitioner's Application must be dismissed.

## STATUTORY AND REGULATORY HISTORY

Title 18, U.S.C. Section 3624(c), provides that shortly before the expiration of federal prisoners' sentences, the BOP must place the prisoners under conditions which will allow them an opportunity to adjust to re-entry into the community. 18 U.S.C. § 3624(c). This pre-release custody is limited in duration to the last ten percent of the prisoners' sentences, not to exceed six months. Id. Section 3624(c) provides:

> **Pre-release custody**. – The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 percentum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.

On December 13, 2002, the Department of Justice's [DOJ] Office of Legal Counsel [OLC] issued a memorandum opinion indicating, in part, that the BOP must literally comply with the requirements of § 3624(c) with respect to placing federal prisoners in pre-release custody. The OLC memorandum stated:

> Your office has advised us that BOP, in exercising its authority under section 3624(c), has sometimes not abided by the time limitation set forth in that section. The authority conferred under section 3624(c) to transfer a prisoner to a non-prison site is clearly limited to a period "not to exceed six months, of the last 10 percentum of the term to be served," 18 U.S.C. § 3624, and we see no basis for disregarding this time limitation.

(Court Exhibit A, Memorandum for Larry D. Thompson Deputy Attorney General, p. 7, n. 6.) Prior to December, 2002, the BOP had a practice of placing non-violent and low-risk prisoners in halfway houses or CCCs, for the last six months of their sentence regardless of the length of their sentences.

(Court Exhibit B.) On December 16, 2002, the Deputy Attorney General forwarded the OLC's memorandum opinion to Kathleen Hawk Sawyer, then Director of the BOP, with a memorandum advising that the "BOP is obligated to adhere strictly . . . to statutory directives," and "immediately should take all steps necessary to ensure that its sentencing placement decisions are in full compliance with the governing law." (Court Exhibit B, Memorandum to Director of BOP, p. 1.) The memorandum emphasizes that the BOP must further comply with the Federal Sentencing Guidelines which were enacted "to enhance the rationality and uniformity in federal sentencing by eliminating, . . . the 'unjustifiably wide range of sentences'" imposed on defendants with similar convictions and criminal histories. (Id., p. 2.)(citations omitted).

The BOP's practice prior to December, 2002, primarily advantaged "white collar criminals" who were typically non-violent and low-risk offenders. However, "[w]hite collar criminals are no less deserving of incarceration, if mandated by the Sentencing Guidelines, than conventional offenders." (Id., p. 3.) Given the preferential treatment to white collar criminals, the OLC feared that the BOP's prior practice ran "the risk of eroding public confidence in the federal judicial system." Accordingly, the Deputy Attorney General advised:

> [W]hile BOP does have limited statutory authority in 18 U.S.C. § 3624(c) to transfer an offender to a CCC prior to his release so as to "afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community," there are firm restrictions on such transfers. Specifically, the transfer may not exceed the *lesser* of (i) the last ten percent of the sentence imposed on the offender, *i.e.*, the period of time in which the offender was committed to the custody of the BOP, or (ii) six months. The OLC opinion concludes that there are no bases for disregarding these time limitations.

(Id., p. 2.) The BOP has since changed its prior practice and will not transfer inmates to halfway houses for any longer than a reasonable portion of the last ten percent of the inmates' sentences.

## PROCEDURE AND FACTS

Petitioner was convicted in the United States District Court for the Southern District of New York of bringing in and harboring aliens, in violation of 8 U.S.C. § 1324, and conspiring to defraud the United States, in violation of 18 U.S.C. § 371. United States v. Zhen, Case No. 1:00-cr-00934 (S.D. N.Y. Aug. 23, 2002). (Document No. 1, p. 1.) The District Court sentenced Petitioner on August 23, 2002, to a 37 month term of imprisonment, to be followed by 36 months of supervised release. (Id.) Petitioner filed her Application under 28 U.S.C. § 2241 in this case on June 18, 2004. (Document No. 1.) Petitioner avers that the BOP's policy implemented in December, 2002, preventing her from spending the last six months of her sentence in a halfway house, is unlawful. Specifically, Petitioner contends that the December, 2002, change in policy (1) constitutes an erroneous interpretation of 18 U.S.C. § 3624(c), (2) violates the notice and comment requirements of the Administrative Procedure Act [APA], (3) violates the Eighth Amendment's proscription of cruel and unusual punishment, and (4) when applied to her, results in irreparable harm.[2] (Id., p. 7.) Although Petitioner had not exhausted her administrative remedies prior to filing her § 2241 Application, she claims that her failure to do so should be excused as the process would be futile. (Id.) She requests that the Court award her a six month placement in a halfway house. (Id.)

---

[2] In support of her claim of irreparable harm, Petitioner states as follows:

Inmate Shao Hao Zhen was at the MINT Program at Hillsboro, WV for 18 months. She has spen[t] every minute with her baby. Her baby doesn't know anybody else besides her mother. Now that Shao Hao Zhen has returned to Alderson, her baby has been sent home to her father. But she is not adjusting too well in her new environment and unfamiliar family members. Also, Ms. Zhen has to seek other employment and will need more time to do so.

(Document No. 1, p. 7.)

4

## DISCUSSION

**A.    Exhaustion of Administrative Remedies.**

**1.    The requirements of the PLRA, are inapplicable to *habeas* proceedings challenging the execution of a sentence under 28 U.S.C. § 2241.**

Challenges to the manner, location, or conditions of the execution of a prisoner's sentence are properly raised under 28 U.S.C. § 2241. See Hernandez v. Campbell, 204 F.3d 861, 864 (9th Cir. 2000)(per curiam)("[P]etitions that challenge the manner, location, or conditions of a sentence's execution must be brought pursuant to § 2241 in the custodial court."); United States v. Miller, 871 F.2d 488, 490 (4th Cir. 1989)(Claim for credit for time served properly raised under § 2241.); Zucker v. Menifee, 2004 WL 102779, *3 (S.D. N.Y. Jan. 21, 2004)("Section 2241 of title 28 has long been recognized as the basis for challenging the execution of the sentence of a person in federal custody or a person sentenced for violating a federal criminal statute."); Monahan v. Winn, 276 F.Supp.2d 196, 204 (D. Mass. Aug. 12, 2003)("It is well established that challenges to the 'manner, location, or conditions of a sentence's execution' are proper subjects of a habeas corpus action under § 2241.")(citations omitted). Petitioner challenges the execution of her sentence, and thus, she has appropriately filed her Petition for *habeas* relief pursuant to § 2241. In other cases filed in this District Court in which issues similar to Petitioner's have been raised, the Respondent has contended however, that because the petitioner is challenging the manner of execution of her sentence under 28 U.S.C. § 2241, as opposed to the "fact or duration" of her confinement, she is subject to the exhaustion requirement of the Prison Litigation Reform Act [PLRA], 42 U.S.C. § 1997e(a) (1996). The PLRA requires that inmates exhaust available administrative remedies prior to filing civil actions "***with respect to prison conditions*** under section 1983 of this title or any other federal law."

5

42 U.S.C. § 1997e(a)(emphasis added).[3]  Exhaustion in § 1997e(a) cases is mandatory and is required even though the administrative process may not afford inmates the relief they might obtain through civil proceedings.  See Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 1820, 149 L.Ed.2d 958 (2001)("Under 42 U.S.C. § 1997e(a), an inmate seeking only money damages must complete any prison administrative process capable of addressing the inmate's complaint and providing some form of relief, even if the process does not make specific provision for monetary relief."). Although Congress did not define the phrase "civil actions with respect to prison conditions," the Supreme Court recently determined that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). The phrase is further implicitly defined in 18 U.S.C. § 3626(g)(2) as "the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison."[4] 18 U.S.C. § 3626(g)(2).

Petitioner is challenging the BOP's decision not to place her in a halfway house for a period of time in excess of either the last ten percent of her sentence or six months. Essentially she is

---

[3] 42 U.S.C. § 1997e(a) provides as follows:

No action shall be brought with respect to prison conditions under section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted.

[4] The Court notes that 18 U.S.C. § 3626 concerns a prisoner's right to prospective relief. In *Porter v. Nussle*, the Supreme Court rested its decision solely in the context of § 1997e and refused to express a "definitive opinion on the proper reading of § 3626(g)(2)." *Porter v. Nussle*, 534 U.S. at 525, n. 3, 122 S.Ct. 988, n. 3.

6

challenging the "manner" or "condition" of the *execution* of her sentence which affects the "duration" of her confinement at FPC Alderson, not the conditions of her confinement as the term "conditions" is commonly understood. "[A]lthough a § 2241 attack on the execution of a sentence may challenge some matters that occur at prison, such as deprivation of good-time credits and other prison disciplinary matters, this does not make § 2241 actions like 'condition of confinement' lawsuits, which are brought under civil rights laws." McIntosh v. United States Parole Comm'n, 115 F.3d 809, 811-12 (10th Cir. 1997)(citations omitted). *Habeas corpus* proceedings attack "the fact or duration of a prisoner's confinement and [seek] the remedy of immediate release or a shortened period of confinement. In contrast, a civil rights action . . . attacks the conditions of the prisoner's confinement and requests monetary compensation for such conditions." Id. (citations omitted).

The Fourth Circuit has not directly held that the PLRA's exhaustion requirements are inapplicable to *habeas* proceedings but has concluded that the PLRA's filing fee requirement is not. In reaching this conclusion, the Fourth Circuit reasoned that the PLRA contains no express provision including *habeas* proceedings within its reach and the text of the PLRA and the Congressional intent reflect a focus on civil rights actions as opposed to *habeas* proceedings. Smith v. Angelone, 111 F.3d 1126, 1129-31 (4th Cir.) *cert. denied*, 521 U.S. 1131, 118 S.Ct. 2, 138 L.Ed.2d 1036 (1997). In distinguishing *habeas* proceedings from civil rights actions, the Court further noted that the PLRA established an installment payment plan for filing "civil actions," but did not alter or otherwise affect the five dollar *habeas* filing fee. Id. Finally, the Court concluded that Congress could not have intended that the three strikes provision found in 28 U.S.C. § 1915(g) would bar any defendant from *habeas* relief. Id., at 1129-31.

The PLRA was primarily enacted to curtail the filing of frivolous prisoner civil rights actions.

See Roller v. Gunn, 107 F.3d 227, 230-31 (4th Cir.) *cert. denied*, 522 U.S. 874, 118 S.Ct. 192, 139 L.Ed.2d 130 (1997). It is of significance that the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 [AEDPA], was enacted only two days prior to the PLRA. Under AEDPA, Congress established separate procedures for addressing abusive *habeas* filings, in addition to the subsequent PLRA enactment. The fact of two separate procedural mechanisms strongly suggests that Congress did not intend the PLRA to apply to *habeas* proceedings. "[H]abeas claims involve someone's liberty, rather than mere civil liability." Davis v. Fechtel, 150 F.3d 486, 490 (5th Cir. 1998). The District Courts for the Eastern District of Kentucky and the District of Massachusetts have held that the PLRA is inapplicable to a petitioner's challenge under § 2241 to the BOP's December, 2002, policy change concerning pre-release custody under § 3624(c). See Colton v. Ashcroft, 299 F.Supp.2d 681, 689 (E.D. Ky 2004)("[T]he PLRA's exhaustion of administrative remedies procedure, as set forth in 42 U.S.C. § 1997e(a), is not applicable to the plaintiff's 28 U.S.C. § 2241 writ of habeas corpus."); Monahan v. Winn, 276 F.Supp.2d at 204 ("The cases before me do not challenge 'prison conditions' as that is commonly understood under § 1983. Rather, they challenge the BOP's rule revision that deprives it of legal discretion to designate certain offenders to community confinement facilities when performing its statutory duty to execute criminal statutes. . . .[A]s such, the statutory PLRA exhaustion requirement  does not apply."). The undersigned agrees with the decisions of these Courts and finds that Petitioner's challenge to the execution of her sentence under § 2241 is not subject to the PLRA's exhaustion requirements.

> **2.**     **The requirement that federal prisoners exhaust administrative remedies prior to seeking *habeas* relief under 28 U.S.C. § 2241 is judicially imposed and therefore, may be excused when the exhaustion process would be futile.**

Nevertheless, federal prisoners challenging the execution of their sentence must exhaust administrative remedies prior to seeking *habeas* review under 28 U.S.C. § 2241. See Pelissero v. Thompson, 170 F.3d 442, 445 (4th Cir. 1999); Fuller v. Rich, 11 F.3d 61, 62 (5th Cir. 1994). Unlike the statutory exhaustion requirement applicable to cases filed under the PLRA and 28 U.S.C. § 2254, the exhaustion prerequisite for filing § 2241 cases is judicially imposed. As such, the exhaustion requirements remain within the Court's discretion and may be waived in certain circumstances. See McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992)(Holding that exhaustion was not required by the PLRA when the prisoner was seeking only monetary damages) *superseded by statute* 42 U.S.C. § 1997e(a)(1996)(Requiring exhaustion of administrative remedies by prisoners even when seeking only monetary damages). The majority of the Circuit Courts of Appeal have held that exhaustion under 28 U.S.C. § 2241 is not required when pursuing administrative remedies would be futile. See Winck v. England, 327 F.3d 1296, 1304 (11th Cir. 2003)(With respect to military *habeas* petitions, exhaustion is generally not required where "administrative appeal would be futile."); Holman v. Booker, 1998 WL 864018, *3 (10th Cir. Dec. 14, 1998)(The futility exception applies to § 2241 "only where there is a recent, adverse determination disposing of the precise point raised by the petitioner seeking to apply the exhaustion requirement."); Campbell v. Barron, 2004 WL 291180 (6th Cir. 2004)(Recognizing a futility exception to § 2241 petitions); Fuller v. Rich, 11 F.3d 61, 62 (5th Cir. 1994)("Exceptions to the exhaustion requirement are appropriate where the . . . attempt to exhaust such remedies would itself be a patently futile course of action."); Beharry v. Ashcroft, 329 F.3d 51, 62 (2d Cir. 2003)(Exhaustion not required when "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative

9

appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question.")(citations omitted).

Petitioner contends that the exhaustion requirement should be waived because it would have been futile to have pursued the administrative remedy process at FPC Alderson in view of the December, 2002, policy change. Alternatively, she contends that exhaustion should be waived because she will be irreparably harmed if she is confined at FPC Alderson beyond the last six months of her sentence.

Although the Fourth Circuit has not directly considered whether a futility exception applies in § 2241 *habeas* cases, the Court held in <u>Rowe v. Peyton</u>, 383 F.2d 709, 711 (4th Cir. 1967) *aff'd*, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968), that a federal prisoner attacking the constitutionality of a future state sentence was not required to exhaust state remedies where the question to be decided was already presented by another prisoner and rejected upon procedural grounds.[5] The holding in <u>Rowe</u> illustrates the Court's willingness to adopt a futility exception to the general exhaustion requirement. <u>Cf</u>. <u>McClung v. Shearin</u>, 2004 WL 225093 (4th Cir. 2004)("Failure to exhaust may only be excused upon a showing of cause and prejudice.").

Under the BOP's Administrative Remedy Program, 28 C.F.R. §§ 542.10 - 19, a process "through which inmates may seek formal review of an issue which relates to any aspect of their confinement," federal prisoners are required first to informally attempt to resolve their grievances and if unsuccessful, file appeals to the Warden, then to the Regional Director, and finally, to the

---

[5] The Court acknowledges that *Rowe* is a pre-AEDPA case and reiterates that the § 2241 exhaustion requirement is judicially imposed rather than statutorily required.

Office of General Counsel.[6] 28 C.F.R. § 542.10. Because Petitioner's ultimate appeal is to the Office

of General Counsel, the entity that issued the December, 2002, memorandum opinion setting forth

the BOP's new policy challenged here, her resort to any further administrative remedies is futile. See

e.g., Colton v. Ashcroft, supra, 299 F.Supp.2d at 690 ("As there has been a prior indication that the

Attorney General's Office has evidenced a strong position on the issue, together with an

unwillingness to reconsider, resort to administrative remedies for this plaintiff is futile."). 

Accordingly, the undersigned finds that Petitioner's failure to fully exhaust her administrative

---

[6] The Administrative Remedy Program however, is not all-encompassing. Section 542.12 (b) provides as follows:

> Requests or Appeals will not be accepted under the Administrative Remedy Program for claims for which other administrative procedures have been established, including tort claims, Inmate Accident Compensation Claims, and Freedom of Information or Privacy Act requests. Staff shall inform the inmate in writing of the appropriate administrative procedure if the Request or Appeal is not acceptable under the Administrative Remedy Program.

28 C.F. R. § 542.12(b). Depending upon at what level an inmate initiates it, the BOP's Administrative Remedy Program is a three-step or four-step grievance procedure. As a general matter, a federal inmate is required first to attempt to resolve her complaints informally by the submission of an "Inmate Request to Staff Member" form. 28 C.F.R. § 542.13. The inmate's request may be rejected if improper, and the inmate will then be advised of the proper administrative procedure. Id. Within 20 days after the circumstances occurred which are the subject of the inmate's complaints, the inmate must complete this first step and submit a formal "Administrative Remedy Request" on a BP-9 form to an institution staff member designated to receive such Requests, 28 C.F.R. § 542.14(a) and (c)(4), or under exceptional circumstances to the appropriate Regional Director. Id., § 542.14(d). The Warden of the institution and the Regional Director must respond to the inmate's Request within 20 and 30 days respectively. Id., § 542.18. If the inmate's Request was directed to the Warden of the institution and the Warden's response is unfavorable, the inmate may appeal within 20 days to the Regional Director on a BP-10. Id., § 542.15(a) and (b). If the inmate's Request went initially to the Regional Director, the inmate may appeal an unfavorable response to General Counsel on a BP-11 form within 30 days after the Regional Director signed the response. Id., § 542.15(a). General Counsel has 40 days to respond to the inmate's appeal. Id., § 542.18. The administrative process is exhausted when General Counsel issues a ruling on the inmate's final appeal. Id., § 542.15(a). The entire process takes about 120 days to complete.

11

remedies prior to filing her instant *habeas* Petition should be excused on the ground of futility. Given

this finding, the undersigned does not consider Petitioner's claim that exhaustion should be excused

because her continued confinement at FPC Alderson will result in her irreparable harm.

      B.      **Application of the BOP's new policy does not violate the Administrative Procedure Act.**

           1.      **The BOP's change in policy constitutes an interpretation of 18 U.S.C. § 3624(c) and therefore, is exempt from the APA's notice and comment requirements.**

When an agency promulgates substantive rules or regulations, the Administrative Procedure

Act [APA], 5 U.S.C. § 553(b)-(d), requires the agency to publish in the Federal Register general

notice of the proposed rule or regulation. 5 U.S.C. § 553(b).[7] After notice is published, interested

_____

    [7]  Section 553(b) provides:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include - -

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply -

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b).

persons must be accorded a period of at least 30 days to comment on the proposed rule or regulation. 5 U.S.C. § 553(c).[8] This notice and comment requirement, however, is inapplicable to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3). Interpretative rules "simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n, 874 F.2d 205, 207 (4th Cir. 1989). "In contrast, a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties." Id. The OLC memorandum and the BOP's new practice merely interprets the meaning of § 3624(c) to not require prisoners' pre-release to CCCs prior to the lesser of the last ten percent of their sentence, or six months. The BOP's new policy, while contrary to its preexisting policy, nevertheless does not impose any new rights or duties or alter the statutory text. Although the new practice reduces the amount of time Petitioner would have spent in a halfway house under the old policy, "an interpretive rule changing an agency's interpretation of a statute is not magically transformed into a legislative rule" because it alters the statute's effect. White v. Shalala, 7 F.3d 296, 304 (2d Cir. 1993). The BOP's new policy is nothing more than an internal agency guideline, which

---

[8] Section 553(c) provides:

After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

5 U.S.C. § 553(c).

is not subject to the rigors of the APA.[9] See Reno v. Koray, 515 U.S. 50, 61, 115 S.Ct. 2021, 2027, 132 L.Ed.2d 46 (1995). In Reno v. Koray, the Supreme Court stated that a BOP's Program Statement is an "internal agency guideline . . . akin to an 'interpretative rule' that 'do[es] not require notice and comment.'" Id. (citations omitted). The BOP's new policy simply corrects a prior misinterpretation of § 3624(c), and states what the BOP believes the statute to require; the statute itself has not changed. Accordingly, the undersigned finds that the BOP's new policy constitutes its interpretation of the requirements of § 3624(c) and, therefore, is excluded from the notice and comment provisions of the APA.

### 2. Judicial review of the BOP's "rulemaking" is not precluded under 18 U.S.C. § 3625.

Title 18 U.S.C. § 3625 provides:

**Inapplicability of the Administrative Procedure Act**

The provisions of sections 554 and 555 and 701 through 706 of title 5, United States Code, do not apply to the making of any determination, decision, or order under this subchapter.

18 U.S.C. § 3625. Section 3625 effectively precludes from judicial review the BOP's adjudicative decisions made pursuant to 5 U.S.C. §§ 554 and 555. Absent from this preclusion, however, is review of the BOP's rulemaking decisions under 5 U.S.C. § 553. See Martin v. Gerlinski, 133 F.3d. 1076, 1079 (8th Cir. 1998); Fristoe v. Thompson, 144 F.3d 627, 630-31 (10th Cir. 1998)("[W]hile § 3625 may preclude us from reviewing the BOP's substantive decision . . . it does not prevent us from interpreting the statute to determine whether the BOP exceeded its statutory authority.");

---

[9] The BOP's practice followed prior to December, 2002, is found in BOP P.S. 7310.04. Although there is no indication that this Program Statement has been amended to reflect the policy change, the new practice nevertheless carries the same weight as a program statement and serves as an internal agency guideline lacking the force of law.

14

Wiggins v. Wise, 951 F.Supp. 614, 618-19 (S.D. W.Va. 1996)("[T]he court finds that 18 U.S.C. § 3625 does not preclude judicial review of agency rulemaking."). Absent some constitutional violation, § 3625 effectively precludes judicial review of any BOP decision with respect to pre-release custody under § 3624(c). In the instant action, however, the Court will consider the merits of Petitioner's claims as she is challenging the constitutionality of the BOP's new policy or interpretation of § 3624(c), as opposed to challenging only the BOP's decision not to place her in a CCC.

C.    The BOP's interpretation of 18 U.S.C. § 3624(c).

1.    The BOP's interpretation of 18 U.S.C. § 3624(c) is a reasonable and permissible construction of the statute.

Petitioner contends that the BOP has erroneously interpreted 18 U.S.C. § 3624(c). In reviewing an agency's interpretation of a statute, it is well settled that the Court must accord "substantial deference" to the agency's reasonable interpretation of a statute Congress has charged it with administering. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 1781-83, 81 L.Ed.2d 694 (1984). When the agency's regulatory action is not subject to the APA, however, deference due under Chevron is inapplicable and the agency's interpretation is only "entitled to some deference. . . [so long as] it is a 'permissible construction of the statute.'" See Reno v. Koray, 515 U.S. at 61, 115 S.Ct. at 2027; see also, Fuller v. Moore, 1997 WL 791681 (4th Cir. Dec. 29, 1997)(BOP program statements are not subject to the rigors of the APA and therefore, are only entitled "some deference."). Although the Supreme Court did not explain the difference between "substantial deference" and "some deference," the Eleventh Circuit explained the meaning of "some deference" as follows:

> We do not think it is obvious, however, that "some deference" means there are
> occasions in which we should uphold the interpretation contained in a BOP program
> statement, even though it is different from the one we would reach if we were
> deciding the matter *de novo*. If that were not true, "some deference" would be the
> same as "no deference," and that would render the Supreme Court's word in <u>Koray</u>
> meaningless.

Cook v. Wiley, 208 F.3d 1314, 1319-20 (11th Cir. 2000). In <u>Christensen v. Harris County</u>, 529 U.S.

576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), in declining to defer to an agency's interpretation

contained in an opinion letter, the Supreme Court stated:

> Interpretations such as those in opinion letters -- like interpretations contained in
> policy statements, agency manuals, and enforcement guidelines, all of which lack the
> force of law -- do not warrant <u>Chevron</u>-style deference. Instead, interpretations
> contained in formats such as opinion letters are "entitled to respect" under our
> decision in <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124
> (1944), but only to the extent that those interpretations have the 'power to persuade.'

<u>Christensen</u>, 529 U.S. at 587, 120 S.Ct. at 1662 (citations omitted). Having already determined that

the BOP's new policy is not subject to the notice and comment provisions of the APA, the

undersigned finds that the new policy is entitled only "some deference" or "respect proportional to

'its power to persuade.'" See <u>United States v. Mead Corp.</u>, 533 U.S. 218, 235, 121 S.Ct. 2164, 150

L.Ed.2d 292 (2001)(citations omitted). Under this framework, the undersigned finds that the BOP's

interpretation of § 3624(c) is a "permissible construction of the statute" and is in accord with its

plain meaning and legislative intent.

The plain language of § 3624(c) expressly limits the BOP's placement of prisoners under pre-

release conditions to "a reasonable part, not to exceed six months, of the last 10 percentum of the

term to be served. . . " 18 U.S.C. § 3624(c). Section 3624(c) does not mandate the method of

achieving these pre-release conditions. Rather their execution, to the extent that such conditions are

practicable, is left to the BOP's discretion. <u>Id</u>. The most common manner in which the BOP achieves

these pre-release conditions is to place prisoners in community confinement, such as halfway houses or CCCs, prior to the end of their sentence. See BOP P.S. 7310.04 ("CCCs provide an excellent transitional environment for inmates nearing the end of their sentences."); see also, United States v. Restrepo, 999 F.2d 640, 645 (2d Cir.) cert. denied, 510 U.S. 954, 114 S.Ct. 405, 126 L.Ed.2d 352 (1993)("Typically such preparatory reentry confinement involves reassignment to a minimum security facility such as a halfway house."). A fortiori, § 3624(c) expressly limits the "back end" placement of federal prisoners in community confinement prior to the end of the prisoner's sentence to the lesser of 10 percent of their sentence, or six months. 18 U.S.C. § 3624(c). See Adler v. Menifee, 293 F.Supp.2d 363, 367 (S.D. N.Y. 2003)("[T]he plain meaning of the statute and the overwhelming majority of the decided cases prevent this Court from granting the relief requested. Back end entry is clearly controlled by 18 U.S.C. § 3624(c) previously quoted and the plain meaning of that statute is obvious.").

Petitioner implicitly contends that the BOP possesses discretionary authority under § 3621(b) to transfer prisoners to community confinement at any time and for any duration, and therefore, the BOP's restrictive interpretation of § 3624(c) and § 3621(b) is unlawful. Section 3621(b) provides:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, . . .. The Bureau may at any time . . . direct the transfer of a prisoner from one penal or correctional facility to another. . . .

18 U.S.C. § 3621(b). Petitioner's claim would require the Court to find that "custody" in community confinement constitutes imprisonment and therefore, the BOP may transfer a prisoner to community confinement at any time during her sentence, regardless of the limitation found in § 3624(c). The

17

vast number of District Courts that have considered the lawfulness of the BOP's new policy have

concluded that, under the canons of statutory construction, § 3624(c) cannot be read in isolation. See

e.g., Grimaldi v. Menifee, 2004 WL 912099, * 3-7 (S.D. N.Y. Apr. 29, 2004)("[T]he Court is

cognizant of another equally important tenet of statutory construction, namely that statutes should

not be read in isolation, and thus must construe § 3624(c) together with § 3621(b)."). Rather, §

3624(c) must be read together with § 3621(b) to determine the BOP's full authority through the

legislative mandate. In construing these sections together, many Courts have concluded that the

BOP's new interpretation is erroneous. See e.g., Id.; Crowley v. Federal Bureau of Prisons, 312

F.Supp.2d 453, 462 (S.D.N.Y. 2004)(District Judge Hellerstein)("[T]he grant of authority to the BOP

in 18 U.S.C. § 3621(b) is broad enough to encompass the power to designate or transfer inmates to

CCCs prior to the final ten percent of their terms, and the OLC Memorandum and the subsequent

change in BOP policy are invalid, as they are based on incorrect readings of 18 U.S.C. § 3621(b).");

DiStefano v. Federal Bureau of Prisons, 2004 WL 396999, * 4-6 (S.D.N.Y. March 4, 2004)(Section

3624(c) "does not limit BOP's authority to place a prisoner in a CCC; instead it mandates that each

prisoner should have the opportunity to be placed in conditions which will help ease the petitioner's

transition out of prison."); Zucker v. Menifee, 2004 WL 102779, * 10 (S.D.N.Y. Jan. 21,

2004)(Concluding that "§ 3621(b), read in conjunction with § 3624(c), allows the BOP to consider

prisoners for CCC placement prior to their six-month/10% date."); Cato v. Menifee, 2003 WL

22725524, *4-6 (S.D.N.Y. Nov. 20, 2003); Monahan v. Winn, 276 F.Supp.2d at 205-212 (Section

3624 "does not and never did mandate pre-release into community or home confinement . . . Section

3621 places federal inmates firmly within the custody of the Bureau of Prisons for their terms of

imprisonment and affords the BOP ample discretion to determine the appropriate location to exercise

that custody."); Howard v. Ashcroft, 248 F.Supp.2d 518, 537-46 (M.D.La. 2003).

These Courts have held that the BOP's policy is erroneous for the following reasons. First, the plain language of § 3621(b) clearly demonstrates that the BOP's broad discretionary authority to "designate the place of prisoners' imprisonment" encompasses community confinement facilities, as well as traditional BOP "prison" facilities. See Grimaldi v. Menifee, 2004 WL 912099 at *4. Because past practice and prior policies are in conflict with the BOP's new interpretation, the prior practices and policies tend to undermine the persuasiveness of the new interpretation. Second, the legislative history of § 3621(b) supports the BOP's prior policy. Id. at *5. Although § 3621(b) does not include its predecessor's (18 U.S.C. § 4082) specific language concerning CCCs, the 1965 amendment to include "or facility" as any available, suitable and appropriate institution encompassed CCCs. Id. Third, neither the statutory text nor legislative history of § 3621(b) supports a finding that the BOP may not designate an inmate to a CCC under § 3621(b) in excess of the last ten percent of the term of imprisonment. Id. Finally, CCCs constitute imprisonment for purposes of § 3621(b). Id. at *5-6:

When a statute is unambiguous, the Court must apply it as written and not resort to rules of statutory construction. Robinson v. Shell Oil Co., 519 U.S. 337, 340 - 41, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). When a statute is ambiguous, it may be read, construed and applied *in pari materia* with other statutes which relate to the same subject matter so that the legislature's intention as gathered from all of the enactments can be effectuated. Erlenbaugh v. United States, 409 U.S. 239, 243 - 44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972). The undersigned finds that § 3624(c) is plain and unambiguous, and finds therefore that resort to § 3621(b) is unnecessary. See Cohn v. Federal Bureau of Prisons, 302 F.Supp.2d 267, 273-74 (S.D.N.Y. 2004 )(District Judge Pauley)(The plain

language of § 3624(c) limits back end placement in community confinement to the last 10 percent

of the prisoner's sentence; "the BOP's current interpretation of § 3624(c), and its interrelationship

with § 3621(b), are reasonable and permissible constructions of those statutes.")[10]; Adler v. Menifee,

293 F.Supp.2d at 368 (finding that the petitioner was "not entitled to the relief sought, in light of the

plain meaning of Section 3624(c)."); Benton v. Ashcroft, 273 F.Supp.2d 1139, 1143-46 (S.D. Cal.

2003); Kennedy v. Winn, 2003 WL 23150108, *2 (D. Mass. July 9, 2003). In Cohn v. Federal

Bureau of Prisons, Judge Pauley determined that even if a CCC constitutes the place of a prisoner's

imprisonment within the meaning of § 3621(b), the specific language of § 3624(c) "operates as an

express limitation on § 3621(b)'s broad grant of general authority." Id., 302 F.Supp.2d at 273. To

not construe § 3624(c) as a limitation on the BOP's § 3621(b) discretionary authority "would vitiate

§ 3624(c)'s 10% restriction, therefore violating the fundamental principle of statutory construction

that courts 'must be reluctan[t] to treat statutory terms as surplusage' in any setting." Id. (citations

omitted). Similarly, in Panchernikov v. Federal Bureau of Prisons, 2004 WL 875633, *2 (S.D.N.Y.

Apr. 23, 2004), although ultimately concluding that the new policy violates the *ex post facto* clause,

the Court concluded that "the language of § 3624(c) limits the broad grant of authority in § 3621(b)

and that the BOP's interpretation of the statutory language is correct." See also, Crapanzano v.

Menifee, 2004 WL 736860, *2, n. 5 (S.D.N.Y. Apr. 5, 2004)("[T]he more specific § 3624(c)

---

[10] In his decision in *Crowley*, District Judge Hellerstein distinguished District Judge
Pauley's decision in *Cohn* factually. *Crowley*, 312 F.Supp.2d at 463. Noting that "the debate has
raged in judicial fora throughout the country, with district courts reaching opposing conclusions",
Judge Hellerstein stated that "there is no indication that the sentencing judge[] in *Cohn* . . . relied
upon BOP procedure. By contrast, I did rely on the prior BOP regime in fashioning my sentence.
The weight of the precedent, in cases similar to Mr. Crowley's, supports my conclusion." *Id.*,
citations omitted.

operates as an express limitation on § 3621(b)'s broad grant of general authority."); cf. Loeffler v. Menifee, 2004 WL 1252925, *5-6 (S.D.N.Y. June 7, 2004)(Finding that the BOP does not have discretion under § 3621(b) to transfer prisoners to CCCs and thus, § 3624(c) appropriately conditions release to CCCs upon time limitations).

Without determining whether placement in a CCC or halfway house constitutes "place of imprisonment" within the meaning of § 3621(b), the undersigned finds that the general grant of authority found in § 3621(b), is limited by the specific language of § 3624(c). To find otherwise would vitiate the express limitation of § 3624(c). Given the BOP's discretionary authority and the plain language of § 3624(c), the undersigned finds that the BOP's new interpretation of § 3624(c) is a reasonable and permissible construction of the statute.[11]

### 2. The legislative history of 18 U.S.C. § 3624(c) supports the BOP's new interpretation.

Looking behind the unambiguous nature of § 3624(c), the legislative history of the statute provides further support for the finding that the BOP's new interpretation is reasonable. Section 3624, enacted in 1984, Pub.L. 98-473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 2008, has been amended a number of times. Specifically, in 1990, while considering certain amendments that would have eliminated the pre-release limitation periods in § 3624(c) and permitted the BOP to place

---

[11] The undersigned notes that this case appears to be one of first impression in this District. Chief Judge Faber's holding in *Barker v. United States*, Civil Action No. 1:03-0226 (S.D.W.Va. Sept. 17, 2003), however, lends support for the undersigned's finding respecting the lawfulness of the BOP's interpretation. In that case, the defendant challenged a similar BOP change in policy which disallowed direct placement of defendants in CCCs either upon the recommendation of the sentencing judge or otherwise. The defendant filed a motion to reduce his sentence claiming that the policy was unlawful and did not reflect the sentencing judge's true intent that he be directly placed in a halfway house. Chief Judge Faber denied his motion and held that the BOP possesses "sole authority to determine where a defendant is incarcerated."

prisoners in community confinement for longer periods of time, the House Judiciary Committee interpreted the proposed amendments as follows:

> Sections 1403 and 1404 address the Federal Bureau of Prisons' authority to place inmates in community corrections programs and home confinement. Currently, the Bureau of Prisons can only place an inmate in a Community Correction Center for up to six months or for the last 10 percent of his or her sentence, whichever is shorter. Section 1403 would authorize the Bureau of [P]risons to place certain non-violent offenders in community facilities for longer time periods at the end of their sentences so that they can better readjust to society. Section 1404 restores the Bureau of Prisons' previously existing authority to designate an appropriate place for offenders to serve their sentences, including Community Correction Centers or home confinement.

H.R. Rep. No. 101-681(I) at 140, *reprinted in* 1990 U.S.C.C.A.N. at 6546. Avid dissenters, however, rejected the elimination of § 3624(c)'s time limits but endorsed the possibility of home confinement during the period of pre-release conditions. The dissenters were concerned in part, that under the amendment convicted felons would not be serving time in jail; rather, they would be in "therapy programs or home detention." Id. at 338. Thus, the amendment passed and added only the sentence: "The authority provided by this subsection may be used to place a prisoner in home confinement." 136 Cong. Rec. 36,930 (1990)(House); 136 Cong. Rec. 36,318 (Senate); Pub.L. No. 101-647, Title XXIX, §§ 2902(a), 2904, Nov. 29, 1990.

In Monahan v. Winn, the District Court concluded that reliance on the reports surrounding the 1990 amendments constitutes nothing more than "a *post hoc* blip from § 3624(c)'s legislative history that allegedly turns all of the preceding law and logic on its head." Id., 276 F.Supp.2d at 209-10. Because the Court found the meaning of § 3621(b) clear on its face, it refused to consider the legislative history of § 3624(c). Id. The undersigned has already determined that the plain language of § 3624(c), reflecting an unwillingness to eliminate § 3624(c)'s time limits, indicates that the

BOP's interpretation is correct. The legislative intent of § 3624(c) serves only as further support for the BOP's position.

### 3. In view of the substantial basis in law and legislative history of the BOP's interpretation of § 3624(c), the BOP's interpretation is not arbitrary and capricious.

To establish that the BOP's interpretation of § 3624(c) is arbitrary and capricious, the Petitioner must demonstrate that the interpretation has "no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations." Kroger Co. v. Regional Airport Auth. Of Louisville and Jefferson County, 286 F.3d 382, 389 (6th Cir. 2002); see also National Motor Freight Traffic Ass'n, Inc. v. Interstate Commerce Comm'n, 590 F.2d 1180, 1184 (D.C. Cir. 1978) cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979)(arbitrary and capricious standard requires the court to defer to the agency's interpretation so long as it contains a rational basis.). Review under this standard "is the least demanding review of an administrative action", Kroger Co., 286 F.3d at 389, and the Court must not "substitute its judgment for that of the agency" unless the agency exhibited a "clear error of judgment." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983). The undersigned has already determined that the BOP's interpretation is a reasonable and permissible construction of § 3624(c) and is supported by legislative history. Consequently, the BOP's interpretation is not arbitrary and capricious. It is unreasonable to interpret § 3621(b) as conferring unfettered discretion to the BOP to place federal prisoners in CCCs at any time during their incarceration. Such unbridled discretion would thwart the intent of both the sentencing Courts and the United States Sentencing Guidelines, that defendants in similar circumstances receive similar sentences. This uniformity of sentencing for like offenses, relevant conduct, and criminal history,

could not be achieved if the BOP possessed the authority to transfer prisoners to community confinement at any time and for any reason. Section 3624(c) was enacted to restrain the BOP's discretion and the BOP's interpretation as such is certainly not contrary to law. Accordingly, the BOP's interpretation is based in law and legislative intent and is not arbitrary and capricious.

      **4.**      **Because the language of § 3624(c) is unambiguous, the rule of lenity is inapplicable to Petitioner's case.**

The rule of lenity is a rule of statutory construction which requires that ambiguities in criminal or punitive statutes must be resolved in favor of the Petitioner. See e.g., United States v. One 1973 Rolls Royce, 43 F.3d 794, 819 (3d Cir. 1994). The rule applies only if ambiguity remains after the Court has applied all established principles of statutory construction. United States v. R.L.C., 503 U.S. 291, 293, 112 S.Ct. 1329, 1332, 117 L.Ed.2d 559 (1992)("No ambiguity about the statute's intended scope survives the foregoing analysis, but if any did, the construction yielding the shorter sentence would be chosen under the rule of lenity."); Chapman v. United States, 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991)(Statute must be ambiguous for rule of lenity to apply.). In Bifulco v. United States, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980), the Supreme Court defined the policy of lenity to mean "that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." In the absence of a statutory ambiguity, "a court may not manufacture an ambiguity in order to defeat Congress' intent." United States v. Blannon, 836 F.2d 843, 845 (4th Cir.) cert. denied, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988). Having determined that the plain language of § 3624(c) supports the BOP's interpretation and that the interpretation is a reasonable and permissible construction of the

law in accord with the legislative intent, the undersigned concludes that the rule of lenity has no application to the analysis of the propriety of the BOP's interpretation.

**D.    The BOP's change in policy does not violate Petitioner's due process rights.**

Although the Fifth Amendment of the United States Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law", the range of protected liberty interests for defendants convicted and confined in prison are significantly reduced for their period of incarceration. See U.S. Const. amend. XIV, § 1; Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). The fact of conviction implies the defendant's transfer of her liberty to prison officials, who in their broad discretion, administer her sentence. Gaston, 946 F.2d at 343. Nevertheless, "confinement to prison does not strip a prisoner of *all* liberty interests." Gaston v. Taylor, 946 F.2d at 343 (emphasis added). To determine whether an inmate retains a certain liberty interest, the Court must look to the nature of the claimed interest and determine whether the Due Process Clause applies. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 2705-06, 33 L.Ed.2d 548 (1972). An inmate holds a protectible right in those interests to which she has a legitimate claim of entitlement. See Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103-04, 60 L.Ed.2d 668 (1979)(*quoting* Board of Regents v. Roth, 408 U.S. at 577, 92 S.Ct. 2709). In Gaston v. Taylor, the Fourth Circuit determined that an inmate possesses a claim of entitlement in those interests "which were not taken away, expressly or by implication, in the original sentence to confinement." Id. at 343. Such interests, however,

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due

Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995)(citations omitted). Consequently, for Petitioner to establish a deprivation of a liberty interest with respect to the application of the new BOP policy to her, she must show either (1) that she has a legitimate entitlement to early release to a halfway house or (2) that the BOP's new policy creates an atypical and significant hardship on her in relation to the ordinary incidents of prison life. See Sandin, 515 U.S. at 483-84, 115 S.Ct. at 2299-2300.[12]

Petitioner does not possess a liberty interest in serving her term of imprisonment in community confinement or in any other particular facility or program. See Olim v. Wakinekona, 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983)("[A]n inmate has no justifiable expectation that he will be incarcerated in any particular prison within a state."); Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976); Prows v. Federal Bureau of Prisons, 981 F.2d 466, 469 n. 3 (10th Cir. 1992), cert. denied, 510 U.S. 830, 114 S.Ct. 98, 126 L.Ed.2d 65 (1993)("[F]ederal prisoners generally enjoy no constitutional right to placement in any particular penal institution."); Brown-Bey v. United States, 720 F.2d 467, 470 (7th Cir. 1983); Moore v. United States Attorney Gen., 473 F.2d 1375, 1376 (5th Cir. 1973). It is well established that under § 3621(b), the BOP possesses discretionary authority to designate the place of prisoners' confinement and direct their transfer to a different facility. 18 U.S.C. § 3621(b). This discretionary authority is

---

[12] Chief Judge Faber held in *Webster v. Adams*, Civil Action No. 1:03-0690 (May 13, 2004) that an inmate's due process rights were not violated when the BOP did not find her entitled to participate in an educational release program. Judge Faber's ruling is being considered on appeal.

curtailed to some extent by § 3624(c), which requires the BOP to place prisoners under pre-release conditions which will prepare them for re-entry into the community. 18 U.S.C. § 3624(c). Nevertheless, § 3624(c) does not direct that the BOP must place prisoners in a particular facility, such as a halfway house, to achieve these "pre-release conditions." Rather, pursuant to § 3621(b), and subject to the § 3624(c) limitation periods, the BOP retains discretion to determine whether the pre-release conditions or programs will be provided within a BOP facility or within a community confinement setting. Accordingly, Petitioner does not possess a statutorily created liberty interest in release to community confinement. See Hager v. United States Attorney Gen., 2004 WL 691578, *2 (N.D. Tex. Mar. 26, 2004)("While the statute does use mandatory language, it relates only to a general guideline to facilitate the prisoner's post-release adjustment through the establishment of some unspecified pre-release conditions. Thus, § 3624(c) does not create a constitutionally protected liberty interest.")(citations omitted); Lyle v. Sivley, 805 F.Supp. 755, 760-61 (D. Ariz. 1992)(Section 3624(c) does not create a protected liberty interest).

Petitioner further does not possess a protected expectation interest in release to a halfway house for approximately the last six months of her term of imprisonment. Such a subjective expectation does not rise to the level of a constitutional claim."[A] mere expectation of a benefit – even if that expectation is supported by consistent government practice -- is not sufficient to create an interest protected by procedural due process. Instead, the statute at issue must create an entitlement to the benefit before procedural due process rights are triggered." Mallette v. Arlington County Employees' Supplemental Ret. Sys. II, 91 F.3d 630, 635 (4th Cir. 1996). Neither the BOP's prior interpretation nor the BOP's Program Statements contain explicit mandatory language or standards limiting the BOP's discretion, which may have given rise to a protected liberty interest in

27

community confinement. See Kentucky Dept. of Corr. v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 1909-10, 104 L.Ed.2d 506 (1989)(Regulations must contain "explicitly mandatory language" to create a liberty interest.). Accordingly, Petitioner does not possess a constitutionally protected expectation interest in pre-release custody in community confinement settings.

Furthermore, the BOP's change in policy does not constitute an "atypical and significant hardship" on Petitioner in relation to the ordinary incidents of prison life. Issues of housing and transfers are issues which occur within the "day-to-day management of prisons." See Sandin v. Conner, 515 U.S. at 482, 115 S.Ct. at 2299; Franklin v. District of Columbia, 163 F.3d 625, 634-35 (D.C. Cir. 1998). Because nothing in the record indicates that Petitioner's conditions of confinement at FPC Alderson, as opposed to community confinement, were atypical or resulted in a significant hardship, the undersigned finds that Petitioner has failed to demonstrate a due process violation. Accordingly, her claim on this ground must be dismissed.

E.     The BOP's application of its new policy does not violate the *Ex Post Facto* Clause.

The *ex post facto* clause, Article 1, Section 9, Clause 3 of the United States Constitution, prohibits the enactment of any law that is retrospective in nature and disadvantages the offender affected by it.[13] See Lynce v. Mathis, 519 U.S. 433, 441, 117 S.Ct. 891, 896, 137 F.2d 63 (1997); Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). Concerning the first element, a law is retrospective if it "changes the legal consequences of acts completed before its

_____

[13]Article 1, Section 9, Clause 3 of the United States Constitution states: "No Bill of Attainder or ex post facto Law shall be passed." Likewise, Article 1, Section 10, Clause 1 of the United States Constitution states: "No state shall . . . pass any Bill of Attainder, ex post facto Law. ..."

effective date." Weaver, 450 U.S. at 31, 101 S.Ct. at 965. Regarding the second element of an *ex post facto* claim, an offender is disadvantaged by "any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" Weaver, 450 U.S. at 28, 101 S.Ct. at 964 (citations omitted). Thus, even if a law is retrospective, the law does not violate the *ex post facto* clause unless it adds to the quantum of punishment. See Weaver, 450 U.S. at 30-31, 101 S.Ct. at 965. The BOP's new policy neither made behavior punishable that was not punishable at the time it was committed, nor has it increased the punishment of a crime beyond the level imposed. Rather, the new policy only corrects the BOP's prior interpretation of a pre-existing statute, 18 U.S.C. § 3624(c). An agency's correction of a misinterpretation of a pre-existing statute does not give rise to an *ex post facto* violation. See Warren v. Baskerville, 233 F.3d 204, 208 (4th Cir. 2000) *cert. denied*, 534 U.S. 831, 122 S.Ct. 76, 151 L.Ed.2d 41 (2001); Crowley v. Landon, 780 F.2d 440, 444 (4th Cir. 1985)(No *ex post facto* violation in correcting prior misinterpretation of law where no law is being applied retroactively.); Metheney v. Hammonds, 216 F.3d 1307, 1310-11 (11th Cir. 2000) *cert. denied*, 531 U.S. 1196, 121 S.Ct. 1200, 149 L.Ed.2d 14 (2001)("A new regulation which just corrects an erroneous interpretation (even if the error was a reasonable one) by an agency of a clear pre-existing statute does not violate the Ex Post Facto Clause."); Cortinas v. United States Parole Comm'n, 938 F.2d 43, 45-46 (5th Cir. 1991)(Change in regulations to correct agency's interpretation of statute pertaining to mandatory forfeiture of street time following revocation of special parole does not violate the *ex post facto* clause.); Caballery v. United States Parole Comm'n, 673 F.2d 43, 47 (2d Cir.) *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Furthermore, when the corrected interpretation was foreseeable, the agency's correction does not violate the *ex post facto* clause even though the current

29

interpretation disadvantages those who relied on its continued misapplication. See Stephens v. Thomas, 19 F.3d 498, 500 (10th Cir.) *cert. denied*, 513 U.S. 1002, 115 S.Ct. 516, 130 L.Ed.2d 422 (1994).

The facts of Stephens v. Thomas are similar to the facts at hand. Mr. Stephens was convicted in the State of New Mexico and sentenced to life imprisonment. Four days prior to his conditional parole release date, *via* good conduct time credit, the Parole Board rescinded his parole pursuant to notification from the Attorney General that the ten year minimums could not be reduced for life imprisonment. This new practice was applicable only to those inmates who had not yet been released on parole and did not revoke the parole of those already released. The Court found that the plain language of the state statute foreseeably established a ten year minimum prior to parole eligibility and that the legislative history did not indicate otherwise. Thus, the Court concluded that there was no *ex post facto* violation. Here, as in Thomas, the plain language of § 3624(c) provides that pre-release conditions, including confinement in a halfway house, is expressly limited to the lesser of the last ten percent of a prisoner's sentence, or six months. Give this plain language, the BOP's new interpretation was foreseeable.

Similarly, in Caballery, the prisoner, charged with absconding from parole, contended that when he was sentenced, the United States Parole Commission's [USPC] practice was not to toll a youth offender's sentence for the time during which he failed to report to his parole supervisor. Caballery, 673 F.2d at 45. He argued that the USPC's application of a new regulation to him, resulting in the tolling of his sentence under the Youth Corrections Act [YCA] for the time during which he absconded from parole, and ultimately a sentence in excess of what it would have been under the prior policy, violated the *ex post facto* clause. Id. Finding that the rehabilitative purposes

of the YCA could only be achieved if the defendant underwent "the treatment and supervision contemplated by the Act.", the Second Circuit concluded that the USPC's prior interpretation was erroneous and that such misinterpretation could not support an *ex post facto* claim. Id. The Court further found that tolling the defendant's sentence neither extended nor increased his original sentence, rather it incorporated "the common law rule that lapse in time does not constitute service of sentence." Id. at 46.

In the present action, as in Caballery, the BOP's new interpretation merely corrected its prior misinterpretation of § 3624(c). The BOP's new interpretation of § 3624(c) neither changes the law nor increases or extends Petitioner's sentence. Rather, the policy only alters the place where Petitioner will serve her sentence, which does not support an *ex post facto* violation. Accordingly, Petitioner has failed to establish that the BOP's new policy added to the quantum of her sentence as required under the second prong of the *ex post facto* analysis. Because the two part analysis of an *ex post facto* claim is conjunctive, the undersigned does not consider the retrospective application of the BOP's new policy to Petitioner and finds that the BOP's policy does not violate the *ex post facto* clause.

**F.     The application of the BOP's new policy to Petitioner does not constitute cruel and unusual punishment in violation of the Eighth Amendment.**

Petitioner contends that if she is "held in FPC Alderson beyond the date that the law allows her to be released (approx. 12-10-04), it would be very cruel and unusual indeed and be a cause for much fear and concern to the petitioner." (Document No. 1, p. 7.) The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. As a general matter, prohibited punishments include those which "involve the unnecessary and wanton infliction

of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(*quoting* Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). The Eighth Amendment "not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Thus under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'")(*quoting* Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). The Eighth Amendment "does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. at 349, 101 S.Ct. at 2400. "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 347, 101 S.Ct. at 2399; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(*citing* Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)); Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990). As previously determined, 18 U.S.C. § 3624(c) does not mandate federal prisoners' pre-release to a CCC or halfway house. Consequently, Petitioner's continued confinement in an actual prison facility, as opposed to pre-release to a halfway

house for the remainder of her sentence, does not equate an excessive sentence in violation of the Eighth Amendment. The undersigned therefore, construes Petitioner's Eighth Amendment claim as a challenge to the conditions of her confinement.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, a prisoner must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (*citing* Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. at 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d at 166 (*quoting* Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.").

Petitioner's allegations do not present a claim of constitutional magnitude. First, the undersigned finds that Petitioner has not suffered a deprivation of a basic human need. While Petitioner admirably desires to return to her community, seek gainful employment, continue her education, and care for her family, the deprivation of these aspects of life is part of the restrictive and uncomfortable nature of serving a term of imprisonment which does not amount to a constitutional

violation. Other than these "deprivations," the record contains no evidence that the conditions of Petitioner's continued confinement at FPC Alderson deprives her of a basic human need or subjects her to harmful or life threatening circumstances. Accordingly, the undersigned finds that Petitioner's conditions of confinement do not objectively give rise to a viable Eighth Amendment claim.

Second, while Petitioner contends that her continued confinement beyond December 10, 2004, is unlawful, this date represents only her ten percent or six month date as opposed to her actual projected release date occurring sometime thereafter. Accordingly, the undersigned finds that Petitioner has not established that the Respondent has acted with deliberate indifference in refusing to release her to a halfway house prior to December 10, 2004. For these reasons, the undersigned finds that there is no evidence that Respondent subjectively deprived Petitioner of a basic human need, and her Eighth Amendment claim therefore, must fail.

## PROPOSAL AND RECOMMENDATION

The undersigned therefore hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **DISMISS** Petitioner's Application (Document No. 1.) with prejudice and remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable Chief United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections

identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to counsel of record and to Petitioner.

ENTER: August 3, 2004.

R. Clarke VanDervort
United States Magistrate Judge



U.S. Department of Justice

Office of Legal Counsel

Office of the Principal Deputy Assistant Attorney General      *Washington, D.C. 20530*

December 13, 2002

## MEMORANDUM FOR LARRY D. THOMPSON
### DEPUTY ATTORNEY GENERAL

*Re: Bureau of Prisons practice of placing in community confinement certain offenders who have received sentences of imprisonment*

Your office has informed us that when a federal offender whom the Bureau of Prisons ("BOP") deems to be low-risk and nonviolent receives a short sentence of imprisonment, BOP often places that offender in a community corrections center, halfway house, or other form of "community confinement," rather than in prison. Your office has asked us to advise you whether BOP has general authority, either upon the recommendation of the sentencing judge or otherwise, to place such an offender directly in community confinement at the outset of his sentence or to transfer him from prison to community confinement during the course of his sentence.

We conclude below that BOP has no such general authority. As we explain, BOP's statutory authority to implement sentences of imprisonment must be construed, wherever possible, to comport with the legal requirements that govern the federal courts' sentencing orders. Community confinement does not constitute imprisonment for purposes of a sentencing order, and BOP lacks clear general statutory authority to place in community confinement an offender who has been sentenced to a term of imprisonment. BOP's practice is therefore unlawful.

### I.

We begin by examining whether federal courts have authority under the Sentencing Guidelines to order that the types of sentences at issue here be satisfied by community confinement.

### A.

The authority to sentence federal offenders to terms of imprisonment rests with the federal courts under the provisions of the Federal Criminal Code and the Sentencing Guidelines promulgated thereunder. *See* 18 U.S.C. §§ 3553, 3581-3582 (2000); *Williams v. United States,* 503 U.S. 193, 200-01 (1992). The Sentencing Guidelines were promulgated by the U.S. Sentencing Commission pursuant to the mandate of the Sentencing Reform Act of 1984, which



Court
Exhibit
A

sought to eliminate arbitrary discrepancies in federal sentencing.[1]  Subject to the court's authority to depart from Guideline sentencing ranges when certain criteria are satisfied, see 18 U.S.C. § 3553(b), federal courts are bound by the provisions of the Sentencing Guidelines when they impose sentences on federal offenders.  See Koon v. United States, 518 U.S. 81, 92 (1996); Stinson v. United States, 508 U.S. 36, 42 (1993).

The Sentencing Guidelines contain base offense levels of increasing severity (from level 1 to level 43), depending upon the seriousness of the offense and the characteristics of the offender with respect to specified criteria.  The sentencing ranges applicable to the respective offense levels are set forth in a Sentencing Table that is published with the Guidelines.  The Sentencing Table is divided into four different Zones, ranging from Zone A (for the shortest sentences) to Zone D (for the most severe sentences).

The BOP practice at issue here applies to Zone C and Zone D sentences.  Zone C encompasses base offense levels 11 and 12 which, in the case of offenses falling into Criminal History Category I (the most favorable criminal history category), establish sentencing ranges of 8 to 14 months of imprisonment and 10 to 16 months of imprisonment, respectively.  Zone D demarcates permissible sentences for base offense levels 13 through 43 and, again assuming Criminal History Category I, provides for a sentencing range of 12 to 18 months of imprisonment for offense level 13, and up to life imprisonment for offense level 43.[2]

For Zone C sentences, section 5C1.1(d) of the Guidelines provides that the minimum term may be satisfied either by a simple "sentence of imprisonment," U.S. Sentencing Guidelines Manual § 5C1.1(d)(1), or by a "sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention," id. § 5C1.1(d)(2).  In the latter case (sometimes referred to as a "split sentence"), section 5C1.1(d) requires "that at least one-half of the minimum term [be] satisfied by imprisonment."  Id.  The Guidelines state that "community confinement" "means residence in a community treatment center, halfway house, restitution center, mental health facility, alcohol or drug rehabilitation center, or other community facility; and participation in gainful employment, employment search efforts, community service, vocational training, treatment, educational programs, or similar facility-approved programs during non-residential hours."  Id. § 5F1.1, Application Note 1.

For Zone D sentences, section 5C1.1(f) requires that the minimum term be satisfied by a simple sentence of imprisonment.  U.S.S.G. § 5C1.1(f).

---

[1]  See Pub. L. No. 98-473, Title II, Ch. II, § 217, 98 Stat. 1837, 2017 (1984), reprinted in 1984 U.S.C.C.A.N. 1837, 2017.

[2]  United States Sentencing Commission, Guidelines Manual, Sentencing Table (Nov. 2001).

12/16/02  MON 14:21 FAX                                                                    ☑ 008

B.

By its plain terms, section 5C1.1 provides only limited authority to a federal court to order that a Zone C sentence of imprisonment be satisfied by community confinement. In particular, it provides only that a federal court may impose a Zone C split sentence under which the sentence of imprisonment "includes a term of supervised release with a condition that substitutes community confinement or home detention . . . , provided that at least one-half of the minimum term is satisfied by imprisonment." U.S.S.G. § 5C1.1(d)(2). With respect to Zone C or Zone D simple sentences of imprisonment, section 5C1.1 provides no authority to substitute community confinement for any portion of the sentence.

Consistent with the plain meaning of section 5C1.1, the federal courts of appeals have uniformly determined that community confinement does not constitute "imprisonment" for purposes of satisfying either the requirement under that section that "at least one-half of the minimum term [of a Zone C split sentence] be satisfied by imprisonment" or the requirement that a Zone C or Zone D simple sentence be a "sentence of imprisonment." In the words of the Second Circuit, "'Imprisonment' and 'community confinement' are not synonyms. 'Imprisonment is the condition of being removed from the community and placed in prison, whereas 'community confinement' is the condition of being controlled and restricted within the community." United States v. Adler, 52 F.3d 20, 21 (2d Cir. 1995). The Seventh Circuit has likewise stated that section 5C1.1 "plainly draws a distinction between 'imprisonment' and either community confinement or home detention" and that this distinction "is consistent with the plain meaning of the term 'imprisonment.'" United States v. Swigert, 18 F.3d 443, 445 (7th Cir. 1994). See also United States v. Voda, 994 F.2d 149, 152 (5th Cir. 1993) (stating, in construing Guidelines provision governing Zone B sentence of probation, that "a community corrections facility is not a jail"); United States v. Latimer, 991 F.2d 1509, 1513 (9th Cir. 1993) (stating, in construing Guidelines provision governing criminal history, that "the division between imprisonment and community treatment center confinement is emphasized again in §5C1.1").[1]

In United States v. Serafini, 233 F.3d 758 (3rd Cir. 2000), the Third Circuit opined that where the district court had imposed on the defendant a Zone C 10-month split sentence, consisting of five months of imprisonment and five months of house arrest, the district court would violate the Guidelines if it ordered that the defendant serve the five months of imprisonment in community confinement. Id. at 762 n.2, 777-778. Determining that the district court had merely recommended (rather than ordered) community confinement, the Third Circuit stated that BOP would violate the Guidelines if it followed the district court's recommendation. Id. at 778. It further emphasized that "a district court has no power to dictate or impose any

_____

[1] Contrary to Latimer and United States v. Pielago, 135 F.3d 703, 711-713 (11th Cir. 1998), the Sixth Circuit in United States v. Rasco, 963 F.2d 132 (6th Cir. 1992), ruled that, for purposes of the Guidelines provision governing criminal history, detention in a halfway house or community treatment center constitutes "being incarcerated." The Sixth Circuit made clear, however, that its ruling had no application to section 5C1.1. See id. at 137.

3

12/16/02  MON 11:22 FAX                                                    ☑️000

place of confinement for the imprisonment portion of the sentence." *Id.* at 778 n.23 (emphasis in original). Similarly, the Sixth Circuit ruled that where the district court had sentenced a defendant "to be imprisoned for a term of ten months," the district court could not substitute community confinement for imprisonment. *United States v. Jalili*, 925 F.2d 889, 892-893 (6th Cir. 1991). Language in the court's order purporting to make this substitution was instead to be "stricken from the order as mere surplusage." *Id.* at 893.[4]

In sum, it is clear that federal courts violate the Guidelines if they order that (1) an offender sentenced to a Zone C or Zone D simple sentence of imprisonment serve his sentence in community confinement, or (2) that an offender sentenced to a Zone C split sentence serve the imprisonment portion of his sentence in community confinement.

## II.

Having determined that a federal court violates the Guidelines if it orders that a sentence of imprisonment be satisfied by community confinement, we now address whether BOP, either on its own initiative or in response to a federal court recommendation, has general authority to implement a Zone C or Zone D sentence of imprisonment by placing an offender in community confinement.

### A.

The Sentencing Reform Act of 1984 not only authorized the Sentencing Guidelines; it also rewrote the provisions governing BOP's implementation of sentences.[5] Under section 3621 of title 18, BOP is responsible for administering the sentences of imprisonment that federal courts impose on federal offenders:

(a) COMMITMENT TO CUSTODY OF BUREAU OF PRISONS. – A person who has been sentenced to a term of imprisonment pursuant to the provisions of subchapter D of chapter 227 shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624.

(b) PLACE OF IMPRISONMENT. – The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may desig-

---

[4] The Sixth Circuit did rule in *United States v. Strozier*, 940 F.2d 985 (6th Cir. 1991), that, for purposes of a Guidelines provision requiring that a court "order a term of supervised release to follow imprisonment when a sentence of imprisonment of more than one year is imposed," the period of community confinement should be included in determining the length of the sentence of imprisonment. Both the Sixth and Seventh Circuits have determined, however, that that ruling on a separate Guidelines provision should not guide the meaning of section 5C1.1. *See Rasco*, 963 F.2d at 137; *Swigert*, 18 F.3d at 446.

[5] *See* Pub. L. No. 98-473, Title II, Ch. II, §§ 212, 217, 98 Stat. 1837, 1987, 2007, 2017 (1984).

4

12/16/02   MON 14:22 FAX   ☒010

nate any available penal or correctional facility that meets the minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering –

> (1) the resources of the facility contemplated;

> (2) the nature and circumstances of the offense;

> (3) the history and characteristics of the prisoner;

> (4) any statement made by the court that imposed the sentence –

>> (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

>> (B) recommending a type of penal or correctional facility as appropriate; and

> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621 (2000). In addition, section 3622 authorizes BOP to "release a prisoner from the place of his imprisonment for a limited period" under specified conditions for purposes that include employment, training, and education. *Id.* § 3622. Section 3624(c) further provides that BOP "shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community." 18 U.S.C. § 3624(c) (2000). It also specifies that "home confinement" may be used for this purpose. *See id.*

## B.

Both BOP's authority under title 18 to implement sentences of imprisonment and the federal courts' sentencing authority under the Guidelines were conferred by the Sentencing Reform Act of 1984. It is therefore especially appropriate that they be construed to produce a harmonious interpretation. *See, e.g., Reno v. Koray*, 515 U.S. 50, 56-57 (1995). Because BOP is merely administering the sentences of imprisonment that the federal courts impose pursuant to the Guidelines, we believe that BOP's authority must be construed, wherever possible, to comport with the legal requirements that govern the sentencing orders. Construing BOP's authority in this way will also promote Congress's objective of eliminating arbitrary disparities in punishment between offenders convicted of the same offense. *See supra* pp. 1-2 & n.1.

5

We recognize that there are certain provisions governing BOP's implementation of sentences of imprisonment that clearly authorize a sentence to be implemented other than according to its seemingly plain terms. In such cases, the rule of construction described above does not come into play because there is no conflict to be resolved. Rather, a harmonious interpretation is achieved in such cases by understanding the sentence to be read in light of, and therefore to incorporate implicitly, the clear statutory provision. For example, section 3621(a) specifies that an offender "who has been sentenced to a term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, *or until earlier released for satisfactory behavior pursuant to the provisions of section 3624*," 18 U.S.C. § 3621(a) (emphasis added). Section 3624(a) in turn provides that a "prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, *less any time credited toward the service of the prisoner's sentence*" for satisfactory behavior, *id.* § 3624(a) (emphasis added). In light of this clear statutory command, we have no doubt that a sentence imposed under the Sentencing Guidelines must be read as being subject to the command. Thus, where a prisoner serving a three-year sentence of imprisonment has received ten days' credit for satisfactory behavior, BOP, in administering the sentence, must release the offender ten days before the three-year period runs.

The question for us here, then, is whether BOP has clearly been given statutory authority to implement Zone C or Zone D simple sentences of imprisonment, or to implement the imprisonment portion of a Zone C split sentence, by placing an offender in community confinement. BOP has pointed to sections 3621(b) and 3622 as possible sources of authority. We address these in turn.

Nothing in section 3621(b) provides BOP clear authority to place in community confinement an offender who has been sentenced to a term of imprisonment. It is true that section 3621(b) gives BOP broad discretion to designate as "the place of the prisoner's imprisonment" "any available penal or correctional facility that meets minimum standards of health and habitability . . . [and] that [BOP] determines to be appropriate and suitable." But the authority to select the *place* of imprisonment is not the same as the authority to decide *whether* the offender will be imprisoned. Under the statutory scheme, the latter authority lies solely with the court (subject to the requirements imposed by the Sentencing Guidelines), and section 3621(b) does not authorize BOP to subvert that statutory scheme by placing in community confinement an offender who has received a sentence of imprisonment. Thus, even if we were to conclude that a community corrections center or halfway house could qualify as "the place of the prisoner's imprisonment" for purposes of this section, we would not read this general conferral of authority as speaking at all to – much less clearly trumping – the requirement under the Guidelines that community confinement not be used to satisfy a Zone C or Zone D simple sentence of imprisonment or the imprisonment portion of a Zone C split sentence. Moreover, if section 3621(b) were read to confer on BOP unfettered discretion to have offenders serve sentences of imprisonment in community confinement, then the time limitation in section 3624(c) on BOP authority to transfer a prisoner to a non-prison site – i.e., for a period, not to

6

12/16/02  MON 14:24 FAX                                                                                      ☒012

exceed six months, of the last 10% of the term of his sentence – would be rendered null with respect to community confinement.[6]

In addition, consistent with the federal courts of appeals' reading of section 5C1.1, *see supra* p. 3, we do not believe that a community corrections center or halfway house is a "place of . . . imprisonment" within the ordinary meaning of that phrase. As we understand it, residents of a community corrections center or halfway house, although still in federal custody, are generally not confined to the facility throughout the day but are instead able to pursue outside employment, training, and education.[7] Indeed, as we understand BOP's policy statement on community corrections centers ("CCCs"), inmates placed in CCCs normally become eligible for weekend and evening leave passes after the second week of confinement. BOP PS 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure, ¶ 7.a(1)-(2) (Dec. 16, 1998), *available at* http://www.bop.gov/progstat/7310_04.html. Reading section 3621(b) as a whole, therefore, we understand the discretion afforded to BOP, under the second sentence, to "designate any available penal or correctional facility that meets minimum standards of health and habitability . . . [and] that [BOP] determines to be appropriate and suitable" to be constrained by the requirement in the first sentence that such facility be a place of imprisonment.[8]

We acknowledge that section 3621(b)(4)(B) provides specifically that BOP may consider, in determining which penal or correctional facility to designate, a judicial statement

---

[6] Your office has advised us that BOP, in exercising its authority under section 3624(c), has sometimes not abided by the time limitation set forth in that section. The authority conferred under section 3624(c) to transfer a prisoner to a non-prison site is clearly limited to a period "not to exceed six months, of the last 10 per centum of the term to be served," 18 U.S.C. § 3624, and we see no basis for disregarding this time limitation.

[7] *See, e.g., Bailor v. Salvation Army,* 51 F.3d 678, 683 (7th Cir. 1995) (describing freedom of residents of halfway house); *United States v. Chavez,* 204 F.3d 1305, 1315 (11th Cir. 2000) ("We have previously held that confinement to a halfway house at night with the requirement that a defendant work at a job or seek employment during the day is a liberty 'markedly different from custodial incarceration in a penitentiary.'" (citing *Dawson v. Scott,* 50 F.3d 884, 888 (11th Cir. 1995)); *United States v. Dighera,* 185 F.3d 875 (Table), 1999 WL 390870, at *2 (10th Cir. June 15, 1999) ("We have previously distinguished sentences involving physical confinement, such as incarceration at a prison camp, from non-secured custody such as placement at a halfway house."); *Richardson v. Steffia,* 105 F.3d 669 (Table), 1997 WL 10964, at *1 (10th Cir. Jan. 14, 1997) ("under the community corrections program, [plaintiff] was able to work in the Denver community at good jobs, travel about the community unescorted, and maintain business and social contacts").

[8] We assume *arguendo* that a community corrections center, halfway house, or other form of community confinement may constitute a "penal or correctional facility" under the provisions of 18 U.S.C. § 3621(b). We note, however, that that term is not defined. In a 1992 opinion in which we concluded that BOP has authority under section 3621 to contract with the private sector for the operation of secure facilities, we declined to draw a distinction between residential community facilities and secure facilities with respect to BOP's contracting-out authority. *See Statutory Authority to Contract with the Private Sector for Secure Facilities,* 16 Op. O.L.C. 65, 70-71 (1992). That opinion, however, did not address the distinct question whether a community corrections center constitutes a "place of imprisonment" under section 3621, nor did it have occasion to consider the line of cases discussed in Part I.B, *supra,* holding that community confinement does not constitute imprisonment.

7

"recommending a type of penal or correctional facility as appropriate." But any contention that this provision clearly indicates that BOP has authority to have an offender serve a sentence of imprisonment in community confinement depends on two mistaken premises — the premise that there are not various types of places of imprisonment, *but see* 28 C.F.R. § 500.1(d) (listing various types), and the premise that BOP is required to give effect to a judicial recommendation.

Section 3622, which provides for temporary release of prisoners, likewise does not provide clear authority to support BOP's practice. In particular, each of the subparts of section 3622 presupposes that an offender is in a "place of . . . imprisonment," and none authorizes extended placement of a prisoner in community confinement. Subsection 3622(a) permits release of a prisoner for no more than 30 days for various purposes, including attending to important family matters (e.g., attending a funeral or visiting a dying relative), obtaining medical treatment, or contacting a prospective employer. Subsection 3622(b), in authorizing the release of a prisoner to "participate in a training or educational program in the community," provides that the prisoner shall "*continu[e]* in official detention at the prison facility." And subsection 3622(c) provides that a prisoner who obtains temporary release for purposes of "paid employment," shall "*continu[e]* in official detention at the penal or correctional facility."

We therefore conclude that the BOP practice is not lawful.

\* \* \*

In sum: When a federal offender receives a Zone C or Zone D sentence of imprisonment, section 3621 and section 3622 of title 18 do not give BOP general authority to place the offender in community confinement from the outset of his sentence. Nor do they give BOP general authority to transfer him from prison to community confinement at any time BOP chooses during the course of his sentence.

*M. Edward Whelan III*

M. Edward Whelan III
Principal Deputy Assistant Attorney General

8

U.S. Department of Justice

Office of the Deputy Attorney General

---

The Deputy Attorney General                    Washington, D.C. 20530

December 16, 2002

### MEMORANDUM

TO:             Kathleen Hawk Sawyer
                Director
                Federal Bureau of Prisons

FROM:           Larry D. Thompson
                Deputy Attorney General

SUBJECT:        Community Corrections Center Placement of Offenders Sentenced to
                Terms of Imprisonment Under Federal Sentencing Guidelines

It has come to my attention that the Federal Bureau of Prisons (BOP) has a policy of accommodating judicial requests (and occasionally acting on its own) to place low-risk, non-violent offenders with short terms of imprisonment in a community corrections center (CCC), even where such placement expressly contravenes the United States Sentencing Guidelines. It is my understanding that BOP adheres to this policy by interpreting the term "imprisonment" in 18 U.S.C. § 3621 (2000) and U.S.S.G. § 5C1.1 (2001), to encompass CCCs, facilities in which offenders are free to leave the institution during approved hours for the purpose of participating in employment and other community programming activities. Recently, I asked the Office of Legal Counsel (OLC) to assess the legality of BOP's practices.

OLC has now issued a formal opinion finding that BOP's policy is unlawful. Accordingly, BOP immediately should take all steps necessary to ensure that its sentencing placement decisions are in full compliance with the governing law. In addition, BOP should transfer to an actual prison facility all federal offenders currently residing in a CCC who, as of today, have more than 150 days remaining on the imprisonment component of their sentence. BOP shall give at least 30 days written notice to each such offender prior to the transfer

I.

The OLC opinion concludes that BOP is obligated to adhere strictly not only to statutory directives, but also to all placement requirements and policies set forth in the Federal Sentencing


Court Exhibit B

Memorandum                                                                    Page 2

Subject:  Community Corrections Center Placement of Offenders Sentenced to
Terms of Imprisonment Under Federal Sentencing Guidelines.

Guidelines.  As you know, the purpose of implementing the Guidelines was to enhance the
rationality and uniformity in federal sentencing by eliminating, to the maximum extent possible,
the "unjustifiably wide range of sentences" imposed on offenders who share similar criminal
histories and who were convicted of similar crimes under similar circumstances.  *Koon v. United
States*, 518 U.S. 81, 92 (1996).  To ignore the Guidelines is to promote the very disparity in
sentencing that the Guidelines seek to eliminate.

       Under the unambiguous language of U.S.S.G. § 5C1.1(d), federal offenders sentenced
under Zone C of the Guidelines may have their minimum term satisfied either by (i) a sentence
of imprisonment, or (ii) a sentence of imprisonment that substitutes community confinement or
home detention for part of the term of imprisonment.  In the latter case – *i.e.*, "split sentences" –
at least one half of the minimum term must be satisfied by imprisonment.  *Id.* § 5C1.1(d)(2).  As
for Zone D offenders, their minimum term must in all circumstances be satisfied by a sentence of
imprisonment.  *Id.* § 5C1.1(f).  The OLC opinion states unequivocally that the mandatory period
of imprisonment required for offenders sentenced under Zones C or D of the Guidelines may not
be substituted by confinement in a community corrections center as imprisonment and
community confinement are simply not synonymous.

                                        II.

       The OLC opinion additionally notes that, while BOP does have limited statutory
authority in 18 U.S.C. § 3624(c) to transfer an offender to a CCC prior to his release so as to
"afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry
into the community," there are firm restrictions on such transfers.  Specifically, the transfer may
not exceed the *lesser* of (i) the last ten percent of the sentence imposed on the offender, *i.e.*, the
period of time in which the offender was committed to the custody of the BOP, or (ii) six
months.  The OLC opinion concludes that there are no bases for disregarding these time
limitations.

                                        III.

       Another concern regarding BOP's CCC placement policies is its potentially
disproportionate, and inappropriately favorable, impact on so-called "white-collar" criminals.  In
promulgating the Sentencing Guidelines, the Sentencing Commission sought to increase the
likelihood of incarceration for white-collar offenders.  Such individuals – even those guilty of
serious economic crimes – frequently enjoyed lenient sentences under pre-Guidelines practice.
As the Guidelines explain:

              Under pre-guidelines sentencing practice, courts sentenced to probation an
       inappropriately high percentage of offenders guilty of certain economic crimes,
       such as theft, tax evasion, antitrust offenses, insider trading, fraud, and
       embezzlement, that in the Commission's views are "serious."

Memorandum                                                                    Page 3
Subject: Community Corrections Center Placement of Offenders Sentenced to
Terms of Imprisonment Under Federal Sentencing Guidelines

The Commission's solution to this problem has been to write guidelines that
classify as serious many offenses for which probation previously was frequently
given and provide for at least a short period of imprisonment in such cases. The
Commission concluded that the definite prospect of prison, even though the term
may be short, will serve as a significant deterrent, particularly when compared
with pre-guidelines practice where probation, not prison, was the norm.

U.S.S.G. Ch. 1, Pt. A, § 4(d)

BOP's current placement practices run the risk of eroding public confidence in the
federal judicial system. White collar criminals are no less deserving of incarceration, if
mandated by the Sentencing Guidelines, than conventional offenders. Indeed, such individuals
are often better educated and more rational than other criminals and are thus more likely to
weigh the risks of possible courses of action against the anticipated rewards of criminal
behavior. As many studies have shown, the prospect of prison – more than any other sanction –
is feared by white collar criminals and has a powerful deterrent effect. Moreover, white collar
crimes often involve not only a high level of intent and calculation, but are committed over an
extended period of time, making the punitive dimension of prison especially deserved in many
cases. With this memorandum, and the accompanying OLC opinion issued last week, I am
confident that the Department of Justice is taking an important step towards ensuring the proper
and fair enforcement of the law.